UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

* * *

RICHARD NICHOLSON,

Petitioner,

v.

RENEE BAKER,[1] *et al.*,

Respondents.

Case No. 3:16-cv-00486-MMD-CSD

ORDER

## I.   SUMMARY

Petitioner Richard Nicholson filed a third amended petition for writ of habeas corpus under 28 U.S.C. § 2254 (ECF No. 71). This matter is before the Court for adjudication on the merits of the remaining grounds in the petition. For the reasons discussed below, the Court denies the petition and denies Petitioner a certificate of appealability.

## II.   BACKGROUND

### A. Facts Underlying Conviction

At trial, the State called Petitioner's ex-girlfriend, Lula Jack, to testify and she testified that she dated Petitioner in 2005. (ECF No. 12-21 at 35.) Petitioner and his ex-girlfriend moved in together and lived with Jack's three daughters. (*Id.*) The relationship broke down and Petitioner moved out of the house. (*Id.* at 36.) About four or five days after Petitioner moved out, he returned to the house to retrieve his belongings, which Jack

---

[1]The state corrections department's inmate locator page indicates that Petitioner is released on parole. *See https://ofdsearch.doc.nv.gov/form.php* (retrieved March 2023 under identification number 1059877). The Nevada Board of Parole is the proper respondent if a petitioner is a parolee, and the state attorney general is the proper catchall respondent in all other anomalous situations that differ from those covered in the advisory committee note. *See Jones v. Cunningham*, 371 U.S. 236, 243-44 (1963); 1976 Advisory Committee Notes to Rule 2(b) of the Rules Governing Section 2254 Cases. At the end of this order, the Court directs the Clerk of Court to substitute the Nevada Parole Board as Respondent for the prior Respondent Renee Baker under Fed. R. Civ. P. 25(d).

1   had put in the garage for him to pick up. (*Id*.)

2       Jack further testified that Petitioner began to bang on a window because a package

3   was missing from his belongings. (*Id*. at 37-38.) After hearing a shattering noise from the

4   back sliding glass door, Jack and her sixteen-year-old daughter ran upstairs. (*Id*. at 38.)

5   Jack's two other daughters, who were thirteen and seven-years-old, were already

6   upstairs. (*Id*.) Jack and her daughter ran into her master bedroom and locked the door

7   behind them. (*Id*. at 39.) Jack testified that Petitioner kicked in the bedroom door and

8   began to hit her face. (*Id*.) Jack's daughter grabbed an aluminum bat that Jack left in her

9   bedroom, hit Petitioner across his forehead with the bat, and her and Petitioner began to

10  fight over the bat. (*Id*. at 40.) Jack's daughter ran downstairs. (*Id*.)

11      Jack testified that she also ran downstairs and observed Petitioner striking her

12  daughter with the bat. (*Id*. at 41.) Jack laid on top of her daughter to shield her from being

13  hit with the bat and Petitioner continued to strike both of them with the bat. (*Id*. at 41.)

14  While being struck, Jack observed her two other daughters standing on the stairs and

15  instructed them to call the police. (*Id*.) Jack testified that Petitioner told her younger

16  daughters not to call the police or they were "going to get the same thing." (*Id*.)

17      The State called Officer Sabino to testify. (ECF No. 12-22 at 4.) Officer Sabino

18  testified that he was dispatched to the scene and was informed that the suspect may still

19  be present. (*Id*.) Officer Sabino approached the house on foot and observed a black male

20  adult in the driveway with his hands waving in the air who stated, "I'm not involved with

21  this." (*Id*.) An officer handcuffed this individual, and the individual was later released. (*Id*.)

22      Officer Sabino then observed the garage door opening and Petitioner walked out

23  of the garage holding an aluminum baseball bat. (*Id*.) Officer Sabino described Petitioner

24  as 6'7" tall, 270 lbs., and that he appeared obviously angry from his actions and

25  demeanor. (*Id*.) Officer Sabino instructed Petitioner to drop the bat, put his hands in the

26  air and lay on the ground. (*Id*.) Petitioner complied and dropped the bat. (*Id*.) Petitioner

27  turned away from Officer Sabino, dropped on his knees, but did not lay further on his

28  stomach. (*Id*.) Officer Sabino placed his foot in the middle of Petitioner's back to push him

1    to the ground to put him in custody. (*Id.* at 6.)

2        **B. Conviction and Appeal**

3        Petitioner challenges a 2010 conviction and sentence that the Eighth Judicial

4    District Court for Clark County imposed. In June 2006, Petitioner was charged with

5    striking his ex-girlfriend and her teenage daughter with a baseball bat. (ECF Nos. 3, 41-

6    2.) Within weeks, Petitioner's appointed counsel requested a competency determination.

7    (ECF No. 11-5.) Although Petitioner was found competent (ECF No. 39-1), trial counsel

8    continued to question his competency as the case moved forward. (ECF Nos. 12-14, 12-

9    17, 39-2; *see also* ECF No. 11-9 at 28.)

10       Following a two-day trial, a jury returned a guilty verdict in May 2009. (ECF No. 12-

11   24.) Trial counsel revisited the issue of Petitioner's competency in July 2009. (ECF

12   No. 11-9 at 37.) New counsel was appointed the following month (*Id.* at 38), and she also

13   doubted Petitioner's competency. (ECF No. 13-5.) Doctors reported some decomposition

14   in new evaluations. (ECF No. 39-3.) Thus, in June 2010, the state court committed

15   Petitioner to receive treatment. (ECF No. 13-7.) Three months later, he completed

16   treatment and was found competent to complete his case. (ECF No. 13-13.)

17       Sentencing went forward, and the state court entered a judgment of conviction on

18   November 10, 2010, giving Petitioner an aggregate sentence of 17 to 50 years in prison.[2]

19   _____

     [2]

| Count | Charge | Sentence |
|-------|--------|----------|
| Count 1 | Burglary while in possession of a deadly weapon | 48–120 months |
| Count 2 | Battery constituting domestic violence with use of a deadly weapon resulting in substantial bodily harm | 60–180 months, concurrent with Count 1 |
| Count 3 | Battery constituting domestic violence with use of a deadly weapon resulting in substantial bodily harm | 60–180 months, consecutive to Count 2 |
| Count 4 | Child abuse and neglect with substantial bodily harm | 60–180 months, consecutive to Count 3 |
| Count 5 | Child abuse and neglect | 24–60 months, consecutive to Count 3 |

1    Petitioner appealed, and the Nevada Supreme Court affirmed his conviction on direct

2    appeal. (ECF No. 14-8.)

3             **C.  State Post-Conviction Proceedings and Federal Habeas Action**

4             Petitioner filed a *pro se* state petition for writ of habeas corpus  seeking post-

5    conviction relief. (ECF No. 14-13.) Counsel was later appointed, and Petitioner filed a

6    counseled supplemental petition. (ECF No. 14-19.) The state court held an evidentiary

7    hearing and denied the state petition. (ECF Nos. 16-14, 16-28.) The Nevada Court of

8    Appeals affirmed the state court's denial of relief. (ECF No. 18-27.)

9             Petitioner mailed the original federal petition initiating this case in August 2016.

10   (ECF No. 5 at 1.) The Court later appointed counsel and granted Petitioner leave to

11   amend the petition. (ECF No. 25.) He filed a counseled first amended petition (ECF

12   No. 38) in March 2019.

13            Respondents moved to dismiss certain claims as untimely and/or unexhausted.

14   (ECF No. 45.) The Court granted Respondents' motion to dismiss in part finding Ground

15   I of the amended petition untimely and Ground IV unexhausted, but deferred Petitioner's

16   actual innocence claim until he addressed the mixed nature of the amended petition.

17   (ECF No. 55.) The Court's granted Petitioner's motion for stay and abeyance to return to

18   state court. (ECF Nos. 56, 58.)

19            In September 2019, Petitioner returned to state court filing a counseled successive

20   state petition for writ of habeas corpus alleging one claim for relief. (ECF No. 65-4.) The

21   state court denied his second state habeas petition as time-barred under NRS §

22   34.726(1), successive under NRS § 34.810(2), and further held that Petitioner failed to

23   present a colorable claim of actual innocence. (ECF No. 65-14.) Petitioner appealed and

24   the Nevada Court of Appeals affirmed that his second state habeas petition was untimely

25   and successive. (ECF No. 65-35.)

26

27

28

| Count 6 | Child abuse and neglect | 24–60 months, concurrent with Count 5 |
|---|---|---|

(ECF Nos. 13-17, 13-18.)

4

1    The Court reopened this case in February 2021. (ECF Nos. 59, 60.) Petitioner filed

2    a second amended petition and Respondents filed a motion to dismiss. (ECF Nos. 61,

3    64.) In December 2021, Petitioner filed his third amended petition. (ECF No. 71.) The

4    Court granted in part Respondents' motion to dismiss finding Ground I untimely and

5    deferred ruling on whether Petitioner can demonstrate cause and prejudice under

6    *Martinez v. Ryan*, 566 U.S. 1 (2017), as to Grounds III and IV. (ECF No. 79.)

7    **III.    LEGAL STANDARD**

8        **A.  Review under the Antiterrorism and Effective Death Penalty Act**

9        28 U.S.C. § 2254(d) sets forth the standard of review generally applicable in

10   *habeas corpus* cases under the Antiterrorism and Effective Death Penalty Act (AEDPA):

11       An application for a writ of habeas corpus on behalf of a person in custody
         pursuant to the judgment of a State court shall not be granted with respect
12       to any claim that was adjudicated on the merits in State court proceedings
         unless the adjudication of the claim –
13

14       (1) resulted in a decision that was contrary to, or involved an unreasonable
         application of, clearly established Federal law, as determined by the
15       Supreme Court of the United States; or
         (2) resulted in a decision that was based on an unreasonable determination
16       of the facts in light of the evidence presented in the State court proceeding.

17   28 U.S.C. § 2254(d). A state court decision is contrary to established Supreme Court

18   precedent, within the meaning of § 2254(d)(1), "if the state court applies a rule that

19   contradicts the governing law set forth in [Supreme Court] cases" or "if the state court

20   confronts a set of facts that are materially indistinguishable from a decision of [the

21   Supreme] Court." *Lockyer v. Andrade*, 538 U.S. 63, 73 (2003) (quoting *Williams v.*

22   *Taylor*, 529 U.S. 362, 405-06 (2000), and citing *Bell v. Cone*, 535 U.S. 685, 694 (2002)).

23   A state court decision is an unreasonable application of established Supreme Court

24   precedent under § 2254(d)(1), "if the state court identifies the correct governing legal

25   principle from [the Supreme] Court's decisions but unreasonably applies that principle

26   to the facts of the prisoner's case." *Id.* at 75 (quoting *Williams*, 529 U.S. at 413). "The

27   'unreasonable application' clause requires the state court decision to be more than

28   incorrect or erroneous. The state court's application of clearly established law must be

1  objectively unreasonable." *Id.* (internal citation omitted) (quoting *Williams*, 529 U.S. at

2  409-10).

3         The Supreme Court has instructed that a "state court's determination that a claim

4  lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree'

5  on the correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. 86, 101

6  (2011) (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). The Court has stated

7  that "even a strong case for relief does not mean the state court's contrary conclusion

8  was unreasonable." *Id.* at 102 (citing *Lockyer*, 538 U.S. at 75); *see also Cullen v.*

9  *Pinholster*, 563 U.S. 170, 181 (2011) (internal quotation marks and citations omitted)

10  (describing the standard as "difficult to meet" and "highly deferential standard for

11  evaluating state-court rulings, which demands that state-court decisions be given the

12  benefit of the doubt").

13         **B.  Standard for Evaluation of Ineffective Assistance of Counsel Claims**

14         In *Strickland v. Washington*, the U.S. Supreme Court propounded a two-prong test

15  for analysis of claims of ineffective assistance of counsel requiring Petitioner to

16  demonstrate that: (1) the attorney's "representation fell below an objective standard of

17  reasonableness[;]" and (2) the attorney's deficient performance prejudiced Petitioner

18  such that "there is a reasonable probability that, but for counsel's unprofessional errors,

19  the result of the proceeding would have been different." 466 U.S. 668, 688, 694 (1984).

20  Courts considering a claim of ineffective assistance of counsel must apply a "strong

21  presumption that counsel's conduct falls within the wide range of reasonable professional

22  assistance." *Id.* at 689. It is Petitioner's burden to show "counsel made errors so serious

23  that counsel was not functioning as the 'counsel' guaranteed . . . by the Sixth

24  Amendment." *Id.* at 687. Additionally, to establish prejudice under *Strickland*, it is not

25  enough for Petitioner "to show that the errors had some conceivable effect on the outcome

26  of the proceeding." *Id.* at 693. Rather, the errors must be "so serious as to deprive the

27  [petitioner] of a fair trial, a trial whose result is reliable." *Id.* at 687.

28         Where a state district court previously adjudicated the claim of ineffective

assistance of counsel under *Strickland*, establishing the decision was unreasonable is especially difficult. *See Richter*, 562 U.S. at 104-05. In *Richter*, the Supreme Court clarified that *Strickland* and § 2254(d) are each highly deferential, and when the two apply in tandem, review is doubly so. *See id.* at 105; *see also Cheney v. Washington*, 614 F.3d 987, 995 (9th Cir. 2010) (internal quotation marks omitted) ("When a federal court reviews a state court's *Strickland* determination under AEDPA, both AEDPA and *Strickland*'s deferential standards apply; hence, the Supreme Court's description of the standard as doubly deferential."). The Court further clarified, "[w]hen § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Richter*, 562 U.S. at 105.

## IV. DISCUSSION

### A. Ground II

#### 1. Additional Background Information

In Ground II, Petitioner alleges trial counsel rendered ineffective assistance for failure to exercise reasonable diligence in locating and interviewing a material witness, Solomon Genovese, in violation of the Sixth and Fourteenth Amendments. (ECF No. 71 at 19-21.) He alleges that Genovese was an eyewitness who would corroborate his self-defense theory. (*Id.*) He asserts that trial counsel failed to demonstrate diligence in locating Genovese despite Petitioner providing Genovese's contact information to counsel. (*Id.* at 20.) As a result, post-conviction counsel also was unable to secure an interview with Genovese. (*Id.*)

Petitioner's trial counsel, Mark Cichoski testified at the evidentiary hearing as follows:

> Q.    What - - when [Genovese] says I have nothing to do with this, does that indicate to you that he may have had knowledge of the underlying circumstances?
>
> A.    Yes.
>
> Q.    What's your memory of your communication with your investigator or your instructions to your investigator with regard to the case?

1    A.    My memory is that I asked him to locate Solomon Genovese
2          and to interview him regarding what he witnessed in regard to
           this incident.

3    Q.    It's your memory that that was before prelim or during or
4          before trial?

5    A.    That was before trial.

     Q.    Do you remember what the investigator may have said back
6          to you or any communication you received back?

7    A.    My memory is that we were unable to locate Mr. Genovese.

8    Q.    Did you have any communication with my client with regard to
           any possible or potential location of Solomon Genovese?
9
     A.    I'm sure that we did.
10
     Q.    Can you be more specific. You say your memory is you
11         weren't able to find him, do you know what steps were went
           through to locate him?
12
     A.    You would have to ask my investigator. I just asked him to find
13         him. I'm not sure what steps he took.

14   Q.    Did your investigator produce any reports?

15   A.    I don't recall a report mentioning Mr. Genovese.
           . . .
16
     Q.    In your judgment was Solomon Genovese an important
17         witness on the case?

18   A.    He could have been. I mean, if he - - my recollection of the
19         case is if he would have been inside of the house, then he
           may have been able to witness the smashing of the sliding
           glass door. He may have witnessed [Petitioner] going
20         upstairs.

21         I don't think he was in the bedroom. If he's downstairs he's not
22         in the bedroom so he's not a witness in anything that
           happened to the adult female. But if he was in the house, he
           would have witnessed the alleged striking of the child because
23         she was - - my memory is she was downstairs on the living
           room couch. So he'd definitely have pertinent testimony to
24         give there.

25   (ECF No. 16-14 at 15-16.)

26         Petitioner testified at the evidentiary hearing that Cichoski visited him two or three

27   times while he was in jail. (*Id*. at 37.) Petitioner further testified that he informed Cichoski

28   that Genovese "can tell [him] the truth." (*Id*. at 38.) Petitioner gave Cichoski the cell phone

8

1   number and street address of Genovese. (*Id.* at 41-42.)

2          The state court denied the state habeas petition and stated as follows at the

3   evidentiary hearing:

4          I agree that there were two issues that were germane to today's hearing.
           The first was what if anything did the public defender's office do to
5          investigate or locate Mr. Genovese. And what if anything, assuming you find
           they're objective was reasonable, what could he have provided by way of
6          evidence to assist [Petitioner] at trial.

7          The latter is kind of arguable as to whether it would have been anything of
           value. Everybody is a witness. [Petitioner] is a witness. The victim mother
8          is a witness. The victim children were witnesses. Mr. Genovese is a witness.
           The police officers were witnesses. Where do they all fill in to there in terms
9          of what they saw and what value did they have, that's determined by what
           they say when they testify and give a statement.
10
           The second thing I'll say is my recollection is that the State was looking for
11         Mr. Genovese as well. They didn't find him either. They had as much
           interest in knowing what this guy was going to say if he was called as a
12         defense as the defense wanted to know as well. So it was not just I believe
           the defense couldn't find him. I don't think the State could find him.
13
           Thereafter, we started this post-conviction Odyssey in November 2012 and
14         went through 2 or 3 investigators before you, Mr. Claus, trying to locate him.
           They couldn't locate him.
15
           It is not surprising that nobody located Mr. Genovese because he's
16         approached and placed in handcuffs by police officers at a scene that I think
           his statement – I agree his statement about I wasn't involved in this
17         indicates some knowledge of something. But I go a step further and say his
           statement was indicative of knowledge that something bad was going on
18         and he wanted everybody to now it wasn't him that was involved in it.

19         So his desire to maybe not be located was very clear to me in terms of the
           difficulty of anybody finding him or moving forward. It's not surprising that
20         nobody was able to locate him.
           . . .
21
           The point being, we were all 2 years into this process, which is a lot of time
22         for anybody to have tried to locate Mr. Genovese during that time. I'm
           satisfied with [Cichoski's] testimony that they made an effort, both on own
23         volition and that he saw it in discovery and wanted to try to find him, as well
           as [Petitioner's] request to try and find him. They simply didn't locate him.
24
           It's a - - you could always continue to peel something back and say well
25         [Cichoski] says he tried to locate him, but I don't know how valid that
           statement is so I want something more. I know he says the investigator did
26         something, but investigators sometimes lie about things.

27         Today was the day for a hearing. This is the 8th time we have set this. Today
           was the date to produce witnesses that were going to be produced. So I'm
28         not continuing it for anything further.

           I just think at the end of the day all the evidence, all the record and within

9

1    the testimony today, is that the public defender's office made an effort to
     locate Mr. Genovese and could not locate Mr. Genovese.
2
     Everybody tried to locate him for these hearings and couldn't locate him. It's
3    questionable at best what if any information he had that would have been
     favorable to [Petitioner], as opposed to being inculpatory. I can't find, based
4    on everything the public defender is ineffective.

5    (ECF No. 16-14 at 55-58.)

6            **2.  State Court Determination**

7            In affirming the denial of Petitioner's state habeas petition, the Nevada Court of

8    Appeals held:

9            To prevail on a claim of ineffective assistance of counsel, a petitioner must
             show that (1) counsel's performance was deficient because it fell below an
10           objective standard of reasonableness and (2) the deficiency prejudiced the
             defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). "A court
11           considering a claim of ineffective assistance must apply a strong
             presumption that counsel's representation was within the wide range of
12           reasonable professional assistance. *Harrington v. Richter*, 562 U.S. 86, 104
             (2011). "To overcome that presumption, a [petitioner] must show that
13           counsel failed to act reasonably considering all the circumstances. *Cullen
             v. Pinholster*, 563 U.S. __. When reviewing a district court's resolution of
14           ineffective-assistance claims, we give deference to the court's factual
             findings if they are supported by substantial evidence and not clearly wrong
15           but review the court's application of the law to those facts de novo. *Lader v.
             Warden*, 121 Nev. 682, 120 P.3d 1164, 1166 (2005).
16
             Here, the district court held an evidentiary hearing and found defense
17           counsel "made multiple attempts to locate Genovese, including asking
             [Petitioner] for Genovese's contact information and asking his investigator
18           to locate Genovese." The record plainly demonstrates the court's finding is
             supported by substantial evidence and is not clearly wrong. We conclude
19           the court did not err by denying [Petitioner]'s petition because [Petitioner]
             failed to demonstrate defense counsel's representation fell below an
20           objective standard of reasonableness. *See Means v. State*, 120 Nev. 1001,
             1012, 103 P.3d 25, 33 (2004) (petitioner bears the burden of proving
21           ineffective assistance of counsel).

22   (ECF No. 18-27 at 2-3.)

23           **3.  Conclusion**

24           The Nevada Court of Appeals' ruling was neither contrary to nor an objectively

25   unreasonable application of clearly established law as determined by the U.S. Supreme

26   Court. In order to show ineffective assistance of counsel based on the failure to interview

27   or call a witness at trial, Petitioner must show that the particular witness was willing to

28   testify, *see United States v. Harden*, 846 F.2d 1229, 1231-32 (9th Cir. 1988), would have

                                            10

1    testified, *see Allen v. Woodford*, 366 F.3d 823, 846 n.2 (9th Cir. 2004), *amended by* 395

2    F.3d 979, 1002 n.2 (9th Cir. 2005), what their testimony would have been, *see United*

3    *States v. Berry*, 814 F.2d 1406, 1409 (9th Cir. 1987), and that their testimony would have

4    been sufficient to create a reasonable doubt as to guilt. *See Tinsley v. Borg*, 895 F.2d

5    520, 532 (9th Cir. 1990).

6         As the Nevada Court of Appeals stated, counsel testified that he attempted to

7    locate Genovese and also asked his investigator to locate Genovese. (ECF No. 18-27 at

8    2.) The witness, however, was unable to be found. The state court opined that the witness

9    likely had a "desire to maybe not be located" based on his statements at the scene, being

10   placed in handcuffs, and the difficulty of anybody being able to locate him. (ECF No. 16-

11   14 at 55-56.) Moreover, Petitioner cannot demonstrate whether the testimony of the

12   witness would have been sufficient to create a reasonable doubt as to Petitioner's guilt.

13   For these reasons, it was reasonable to find Petitioner had not shown his counsel was

14   deficient. Therefore, the Court of Appeals reasonably determined Petitioner did not

15   demonstrate his counsel fell below an objective standard of reasonableness in

16   accordance with the first prong of *Strickland*.

17        To prevail on an ineffective assistance of counsel claim, Petitioner must show his

18   trial counsel acted deficiently and "a reasonable probability that, but for counsel's

19   [deficiencies], the result of the proceeding would have been different." *Strickland*, 466

20   U.S. at 694. However, the Court need not "address both components of this inquiry" if

21   Petitioner "makes an insufficient showing on one." *Id.* at 697. Therefore, the *Strickland*

22   inquiry need not continue, and Petitioner is denied federal habeas relief for Ground II.

23        **B. Cause and Prejudice under the *Martinez* Exception**

24        When a petitioner has procedurally defaulted his claims, federal habeas review

25   occurs only in limited circumstances. In *Martinez*, the United States Supreme Court held

26   that the absence or inadequate assistance of counsel in an initial review collateral

27   proceeding may be relied upon to establish cause excusing the procedural default of a

28   claim of ineffective assistance of trial counsel. 566 U.S. at 9. The Nevada Supreme Court

1    does not recognize *Martinez* cause as cause to overcome a state procedural bar under

2    Nevada state law. *Brown v. McDaniel*, 130 Nev. 565, 331 P.3d 867, 875 (Nev. 2014).

3    Thus, a Nevada habeas petitioner who relies upon *Martinez* – and only *Martinez* – as a

4    basis for overcoming a state procedural bar on an unexhausted claim can successfully

5    argue that the state courts would hold the claim procedurally barred but that he

6    nonetheless has a potentially viable cause and prejudice argument under federal law that

7    would not be recognized by the state courts when applying the state procedural bars. "[A]

8    procedural default will not bar a federal habeas court from hearing a substantial claim of

9    ineffective assistance at trial if 'the default results from the ineffective assistance of the

10   prisoner's counsel in the collateral proceeding.'" *Martinez*, 566 U.S. at 17.

11        To establish cause and prejudice to excuse the procedural default of a trial-level

12   ineffective assistance of counsel claim under *Martinez*, a petitioner must show that: (1)

13   post-conviction counsel performed deficiently; (2) there was a reasonable probability that,

14   absent deficient performance, the result of the post-conviction proceeding would have

15   been different; and (3) the underlying ineffective assistance of trial counsel claim is a

16   substantial one. *See Ramirez v. Ryan*, 937 F.3d 1230, 1241 (9th Cir. 2019). Determining

17   whether there was a reasonable probability that the result of the post-conviction

18   proceedings would be different "is necessarily connected to the strength of the argument

19   that trial counsel's assistance was ineffective." *Id.*

20        To show that a claim is "substantial" under *Martinez*, a petitioner must demonstrate

21   that the underlying ineffectiveness claim has "some merit." *Martinez*, 566 U.S. at 14. That

22   is, the petitioner must be able to make at least some showing that trial counsel performed

23   deficiently, and that the deficient performance harmed the defense. *See Strickland*, 466

24   U.S. at 695-96. When evaluating counsel's choices, the Court must make "every effort

25   . . . to eliminate the distorting effects of hindsight, to reconstruct the circumstances of

26   counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at

27   the time." *Id.* at 689. "[C]ounsel should be strongly presumed to have rendered adequate

28   assistance and made all significant decisions in the exercise of reasonable professional

1    judgment." *Pinholster*, 563 U.S. at 189. Here, Petitioner advances only *Martinez* as a

2    basis for excusing default for Grounds III and IV.

3                          **1.  Ground III**

4                       **i.  Additional Background Information**

5            In Ground III, Petitioner alleges that trial counsel rendered ineffective assistance

6    for failure to object to an unconstitutional reasonable doubt instruction in violation of the

7    Sixth and Fourteenth Amendments. (ECF No. 71 at 21-25.) He asserts that the

8    reasonable doubt instruction shifted and lowered the burden of proof as well as relieved

9    the State of its obligation to prove all elements of the charged crime. (*Id*. at 22.) The

10   reasonable doubt instruction stated as follows:

11           A reasonable doubt is one based on reason. It is not mere possible doubt
             but is such a doubt as would govern or control a person in the more weighty
12           affairs of life. If the minds of the jurors, after the entire comparison and
             consideration of all the evidence, are in such a condition that they can say
13           they feel an abiding conviction of the truth of the charge, there is not a
             reasonable doubt. Doubt to be reasonable must be actual, not mere
14           possibility or speculation.[3]

15   (ECF No. 12-23 at 8.) Petitioner asserts that the instruction "grossly exaggerates the

16   magnitude of doubt a juror must have in order to return a 'not guilty' verdict." (ECF No. 71

17   at 22.) Although Petitioner acknowledges that the Nevada Supreme Court has ruled

18   against similar challenges in prior cases, he alleges that reasonably competent trial

19   counsel would have still objected to the language because the state appellate court could

20   have provided relief nonetheless, the United States Supreme Court could have

21   invalidated the language, or the problem would have been remedied in federal habeas

22   corpus proceedings. (*Id*. at 24.)

23                       **ii.  *Martinez* does not apply to Ground III.**

24           The Court finds that Ground III is not substantial within the meaning of *Martinez*.

25   566 U.S. at 14. The constitutionality of the reasonable doubt jury instruction depends on

26   " 'whether there is a reasonable likelihood that the jury understood the instructions to

27   allow conviction based on proof insufficient to meet' the requirements of due process."

28

_____

[3]*See* NRS § 175.211.

1     *Ramirez v. Hatcher*, 136 F.3d 1209, 1211 (9th Cir. 1998), *cert. denied*, 525 U.S. 967

2     (1998) (quoting *Victor v. Nebraska*, 511 U.S. 1, 6 (1994)). The reasonable doubt

3     instruction used at Petitioner's trial was the same instruction challenged in *Ramirez*, which

4     the Ninth Circuit Court of Appeals criticized, but upheld as constitutional. *Ramirez*, 136

5     F.3d at 1214-15; *see also Nevius v. McDaniel*, 218 F.3d 940, 944-45 (9th Cir. 2000) ("The

6     law of this circuit . . . forecloses Nevius's claim that his reasonable doubt instruction was

7     unconstitutional").

8          Petitioner fails to demonstrate that his underlying ineffective assistance of counsel

9     claim is substantial because he fails to demonstrate that his counsel was deficient or

10    resulting prejudice under *Strickland*. Counsel's "[f]ailure to raise a meritless argument

11    does not constitute ineffective assistance." *Boag v. Raines*, 769 F.2d 1341, 1344 (9th Cir.

12    1985); *see also Jones v. Smith*, 231 F.3d 1227, 1239 n.8 (9th Cir. 2000). "This court has

13    repeatedly reaffirmed the constitutionality of Nevada's reasonable doubt instruction."

14    *Buchanon v. State*, 69 P.3d 694, 708 (Nev. 2003). Accordingly, the Court determines that

15    Ground III is without merit. Petitioner's post-conviction counsel was not ineffective for not

16    asserting this claim. Petitioner does not demonstrate cause and prejudice relative to the

17    procedural default. The Court denies Ground III.

18          **2. Ground IV**

19             **i. Additional Background Information**

20         In Ground IV, Petitioner alleges that trial counsel rendered ineffective assistance

21    for failure to investigate and present defenses and mitigation based on Petitioner's mental

22    health and mental state in violation of the Sixth and Fourteenth Amendments. (ECF No.

23    71 at 25-39.) Petitioner asserts that trial counsel focused on competency, but trial counsel

24    failed to investigate or present argument as to how Petitioner's mental health affected his

25    culpability. (*Id*. at 38.) He asserts that trial counsel should have argued that Petitioner did

26    not have the requisite *mens rea* based on the evidence that Petitioner suffered from

27    schizophrenia, paranoid delusions, and hallucinations. (*Id*.) In addition, Petitioner argues

28    that trial counsel failed to present his mental health as mitigation evidence at sentencing.

1     (*Id*.)

2          In July 2006, Petitioner's trial counsel requested a competency evaluation. (ECF

3     No. 11-5 at 3.) Petitioner's CCDC medical records indicate "suicide attempt x2." (ECF No.

4     41-1 at 82.) In June 2006, Petitioner reported occasional auditory hallucinations and

5     under the delusions category, the medical professional indicated a question mark as to

6     the presence of paranoid delusions. (ECF No. 41-1 at 83.) Moreover, the June 2006

7     record appears to indicate a diagnosis of schizophrenia. (*Id*.)

8          In August 2007, Petitioner failed to appear for calendar call and subsequently was

9     arrested on a bench warrant. (ECF No. 12-14 at 3.) In October 2008, Dr. Harder evaluated

10    Petitioner at the request of his trial counsel. (*Id*. at 9.) Dr. Harder found Petitioner

11    competent to stand trial. (*Id*. at 10.) In October 2008, Petitioner consented to the

12    administration of medication, Risperdal, which is an antipsychotic medication that treats

13    schizophrenia and bipolar disorder. (ECF Nos. 41-1 at 78, 71 at 28.)

14         On December 2, 2008, at calendar call, trial counsel informed the state court that

15    defense was not ready to proceed because Petitioner has not provided a list of witnesses.

16    (ECF No. 39-2 at 3.) Trial counsel further provided that Dr. Harder found Petitioner "a

17    borderline candidate for competency" and that if Petitioner does not have a defense,

18    "maybe he is delusional." (*Id*. at 5-6.) Upon questioning from the court, Petitioner

19    responded that he has over 36 witnesses for his case. (*Id*. at 7.)

20         On December 11, 2008, CCDC medical records indicate Petitioner experienced

21    auditory hallucinations. (ECF No. 41-1 at 91.) On January 30, 2009, the record indicates

22    that Petitioner denied hallucinations and continued to refuse medications. (*Id*. at 71.)

23         In February 2009, trial counsel filed a motion to suspend proceedings pending a

24    determination as to Petitioner's competency to stand trial. (ECF No. 12-14.) Trial counsel

25    attached Dr. Harder's evaluation and represented that Petitioner was being housed in the

26    psychiatric ward of CCDC. (*Id*. at 3, 9-12.) Trial counsel further argued that he pressed

27    Petitioner for a list of witnesses and other evidence and has not received any of the

28    requested information. (*Id*. at 4.)

1    In February 2009, CCDC medical records indicate that Petitioner presented poor

2    eye contact and reported "auditory hallucinations command type to kill self and others,"

3    in addition to poor sleep "due to voices." (ECF No. 41-1 at 67.) On February 19, 2009, a

4    report indicates that Petitioner covered his door with his mattress. (*Id*. at 63.) When asked

5    to take down his mattress, Petitioner threw feces on the door. (*Id*.) Petitioner sat on his

6    bunk and when his name was called, Petitioner covered his face and was mute, did not

7    make eye contact, and was nonresponsive. (*Id*.)

8    Dr. Harder evaluated Petitioner on March 2, 2009 finding "schizophrenia,

9    undifferentiated chronic." (ECF No. 41-2 at 4.) Dr. Mortillaro also evaluated Petitioner on

10   March 7, 2009 finding schizophrenia, depression, and anti-social personality traits. (*Id*.)

11   Petitioner, however, was competent to stand trial and trial commenced in May 2009. (ECF

12   Nos. 12-17 at 3, 12-21.) During jury selection, Petitioner interrupted the court. (*See* ECF

13   Nos. 12-21 at 8, 71 at 33-4.) A potential juror asked if Petitioner was mentally challenged.

14   (*Id*.) Petitioner had an outburst during opening argument. (*Id*. at 34.) At trial, trial counsel

15   argued that Petitioner acted in self-defense and that there was a lack of evidence.

16   In May 2010, after trial and before sentencing, the state court set another

17   competency hearing. (ECF No. 39-3.) The court noted that Dr. Chambers and Dr.

18   Mortillaro found Petitioner competent in March 2009, "although they did indicate a number

19   of concerning diagnoses, including Axis 1 diagnoses at that time. Those same diagnoses

20   are present this time, but it would appear, pursuant to the reports, there's been obviously

21   some pre-competency in some regards to Mr. Nicholson's mental status such they both

22   found him not competent at this time." (*Id*. at 5.) The state court referred Petitioner to

23   Lakes Crossing. (*Id*.) In September 2010, the state court ruled Petitioner was competent

24   and ordered his transport from Lakes Crossing to CCDC. (ECF Nos. 13-12, 13-13.)

25              **ii.  *Martinez* does not apply to Ground IV.**

26        **a.  Petitioner's claim that counsel did not investigate or present a defense
            based on mental health is not substantial.**
27

28   Defense counsel has a "duty to make reasonable investigations or to make a

16

1    reasonable decision that makes particular investigations unnecessary." *Strickland*, 466

2    U.S. at 691. Moreover, "strategic choices made after thorough investigation of law and

3    facts relevant to plausible options are virtually unchallengeable." *Id*. at 690.

4    "[I]neffective assistance claims based on a duty to investigate must be considered in light

5    of the strength of the government's case." *Bragg v. Galaza*, 242 F.3d 1082, 1088 (9th Cir.

6    2001), *opinion amended on denial of reh'g*, 253 F.3d 1150 (9th Cir. 2001). In general,

7    claims of failure to investigate must show what information would be obtained with

8    investigation, and whether, assuming the evidence is admissible, it would have produced

9    a different result. *See Hamilton v. Vasquez*, 17 F.3d 1149, 1157 (9th Cir. 1994); *Wade v.

10   Calderon*, 29 F.3d 1312, 1316-17 (9th Cir. 1994), *overruled on other grounds* by *Rohan

11   ex rel. Gates v. Woodford*, 334 F.3d 803, 815 (9th Cir. 2003).

12         Here, the investigation that counsel conducted was reasonable under the

13   circumstances. Moreover, Petitioner fails to demonstrate that had trial counsel defended

14   liability on the basis of insanity, argued that Petitioner lacked *mens rea* based on his

15   mental health history, and presented a defense at trial based on Petitioner's mental health

16   that the outcome of the trial would have been different. Under Nevada law, criminal

17   defendants are presumed to be legally sane, and, to prevail with an insanity defense,

18   must overcome that presumption with a preponderance of the evidence. *See Williams v.

19   State*, 885 P.2d 536, 538 (Nev. 1994). Nevada recognizes the defense of legal insanity

20   and applies the *M'Naghten* rule. *See, e.g., Miller v. State*, 911 P.2d 1183, 1185 (Nev.

21   1996).

22         "To qualify as being legally insane, a defendant must be in a delusional state such

23   that he cannot know or understand the nature and capacity of his act, or his delusion must

24   be such that he cannot appreciate the wrongfulness of his act, that is, that the act is not

25   authorized by law." *Finger v. State*, 27 P.3d 66, 84-85 (Nev. 2001). "The fact that a

26   person had mental health problems did not necessarily mean that he or she could meet

27   the *M'Naghten* test for insanity." *Id*. at 72.

28         Trial counsel requested Petitioner's CCDC medical records as well as multiple

competency evaluations and arranged for multiple mental health professionals to evaluate Petitioner. Although Petitioner was diagnosed with schizophrenia, he was determined competent to stand trial. Petitioner does not demonstrate that he had a clinical mental health history beyond the competency evaluations or CCDC medical records. Moreover, Petitioner's evaluations and/or reports documenting Petitioner's mental state occur at least one year after the date of the crime. *See generally Griffin v. Johnson,* 350 F.3d 956, 965 (9th Cir. 2003) (psychiatric evaluation that was years apart from the crime was of minimally probative value in establishing mental state at time of the crime).

Moreover, there was evidence at trial that undermined the contention that the crimes were a product of insanity. Petitioner went to Jack's residence to pick up his belongings and Jack testified that Petitioner became "belligerent" when he was unable to locate a package. (ECF No. 12-21 at 38.) Petitioner struck Jack and chased her daughter downstairs when her daughter hit him with an aluminum bat. (*Id*. at 40.) Petitioner instructed Jack's younger two daughters not to call the police when Jack told them to do so. (*Id*. at 41.) Officer Sabino testified that he observed Petitioner leaving the house with a satchel and holding an aluminum bat. (ECF No. 12-22 at 5.) Petitioner complied with Officer Sabino's instructions to drop the bat upon his arrest. (*Id*.)

Considering all of the circumstances and "applying a heavy measure of deference to counsel's judgments" as required by *Strickland*, Petitioner's underlying ineffective assistance of counsel related to trial counsel's investigation of Petitioner's mental health and presenting a defense related to his mental health fails. Petitioner cannot meet the second prong of the *Martinez* test, which requires a petitioner to show a reasonable probability that the result of the post-conviction proceedings would have been different absent post-conviction counsel's deficient performance. *See Ramirez*, 937 F.3d at 1242.

**b. Petitioner's claim that counsel did not present mitigation argument based on mental health is not substantial.**

At sentencing, Petitioner's counsel presented argument in mitigation requesting concurrent sentences and a sentencing range of 5 years based on in part Petitioner's

mental health. Counsel provided as follows at sentencing:

> What's interesting about the PSI and what's interesting about the danger eval is that on page 4 of the PSI it addresses whether or not his mental health is malingering. It says, no.
>
> In regard to the danger eval, it's clear that there's mental health issues. Furthermore, on the PSI at page 3, it goes to the list of the mental health issues that [Petitioner] is battling. As well as the history of the case, since I was appointed, he went to Lakes Crossing. He's returned. And [Petitioner] is requesting an opportunity at probation. Again, he maintains his innocence.
>
> He would like the court to understand that based on that Social Security paperwork he has a 5th grade education. He's asking for an opportunity to be released to the community.
>
> If your honor is not inclined to grant him that due to his mental health issues, which is his request, I would be requesting that - - I think looking at the PSI, they're asking for consecutive time based on what they say is a danger eval, that he comes back at high risk to reoffend. Had he come back at a low risk to reoffend they would have asked for concurrent time on all these counts. But he came back at mid-level. They're recommending 17 years on the bottom end for this, which, taken in consideration the length of time he's already been in custody, take into consideration the nature of what happened at trial, his mental health issues and the type of injuries that the victims sustained, I would be asking for a sentence of concurrent time between counts, and for a sentencing range somewhere along the area of 5 years.
>
> . . .
>
> He does have a criminal history. He does have 5 priors. Your honor, they are for forgery. He does have some misdemeanor battery charges. He does have a felony for threatening, intent to terrorize, which was 36 months and probation 180 days in jail that ended up in LA. He has several forgery type charges.
>
> I understand that the State sees this, perhaps, as violent, but when you look at what it is and you look at his mental health issues, you start to see that some of the stuff could be due to schizophrenic history.
>
> Your honor is also aware how long this case has been in the system waiting for sentencing and the reasons why this happened. [Petitioner] is asking that you take that into consideration.
>
> So based on that, we feel that it's excessive to give him consecutive time of 17 years. We'd ask for something far less than that.

(ECF No. 13-17 at 11-13.)

At sentencing, the state court considered the arguments and held as follows:

> But I will say, [Petitioner], although I am sympathetic, I believe you do have a number of issues related to mental health, even though you are legally competent. I don't think it is a malingering thing. I do think there is some validity in all of this.

But despite that, it's clear you have got a long history of engaging in criminal conduct and concerning conduct. Separate and apart from the 5 felony convictions, I've got '95 battery, 2003 domestic violence, 2004 domestic violence, 2007 battery, obstructing an officer, 2008 obstruction an officer. There is the terroristic threats, which is a California version in some respects of domestic violence, which is a felony.

So I can see why P&P comes up with the recommendation. Despite your statement, you know what, I have learned my lesson. I wouldn't do anything bad. I have to punish based on what I think you did, what you've done, and my fears about what you could do. Taking all of those into consideration, I'm not going to give you 17 years on the bottom end, like P&P is recommending. I'm not going to give you 5 years on the bottom end like your attorney recommends either.
. . .

So all the counts have independent justification for being filed, went to trial, and having guilty verdicts. That doesn't mean they all deserve consecutive time.

(ECF No. 13-17 at 15-17.)

In evaluating prejudice, the Ninth Circuit has stated that courts should compare the evidence petitioner alleges should have been presented with what was actually presented at sentencing and determining whether the difference "is sufficient to 'undermine the confidence in the outcome' of the proceeding." *Lambright v. Schriro*, 490 F.3d 1103, 1121 (9th Cir. 2007). Here, there was ample argument and evidence presented regarding Petitioner's mental health. The state court noted consideration of mitigating evidence including Petitioner's issues related to mental health and consideration of aggravating evidence, particularly Petitioner's long history of criminal conduct. Petitioner fails to demonstrate that presentation of further cumulative evidence related to Petitioner's mental health would result in a different outcome at sentencing.

Petitioner does not show that his trial counsel performed unreasonably at sentencing or that the alleged deficiency was such as to give rise to a reasonable probability that, but for the alleged deficiency, the result of the sentencing would have been different. *See Strickland*, 466 U.S. at 688. Petitioner does not demonstrate cause and prejudice relative to the procedural default. The Court denies Ground IV.

///

///

1   **V.    CERTIFICATE OF APPEALABILITY**

2          This is a final order adverse to Petitioner. Rule 11 of the Rules Governing Section

3   2254 Cases requires the Court to issue or deny a certificate of appealability ("COA").

4   Therefore, the Court has *sua sponte* evaluated the claims within the petition for suitability

5   for the issuance of a COA. *See* 28 U.S.C. § 2253(c); *Turner v. Calderon*, 281 F.3d 851,

6   864-65 (9th Cir. 2002). Under 28 U.S.C. § 2253(c)(2), a COA may issue only when the

7   petitioner "has made a substantial showing of the denial of a constitutional right." With

8   respect to claims rejected on the merits, a petitioner "must demonstrate that reasonable

9   jurists would find the district court's assessment of the constitutional claims debatable or

10  wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (citing *Barefoot v. Estelle*, 463 U.S.

11  880, 893 & n.4 (1983)). For procedural rulings, a COA will issue only if reasonable jurists

12  could debate (1) whether the petition states a valid claim of the denial of a constitutional

13  right and (2) whether this Court's procedural ruling was correct. *See id.*

14         Applying these standards, this Court finds that a COA is unwarranted.

15  **VI.   CONCLUSION**

16         It is therefore ordered that Petitioner Richard Nicholson's third amended petition

17  for writ of habeas corpus under 28 U.S.C. § 2254 (ECF No. 71) is denied.

18         It is further ordered that a certificate of appealability is denied.

19         The Clerk of Court is directed to substitute the Nevada Board of Parole for

20  Respondent Renee Baker, enter judgment accordingly, and close this case.

21         DATED THIS 9th Day of March 2023.

22

23  _____

24  MIRANDA M. DU
    CHIEF UNITED STATES DISTRICT JUDGE

25

26

27

28